FILED
2020 JAN 10 PM 3:24
CLERK
U.S. DISTRICT COURT

## UNITED STATES DISTRICT COURT
### DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| DARRELL L. DEEM, et. al., | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| Plaintiffs, | |
| v. | |
| TRACEY BARON, et. al., | 2:15-CV-00755-DS |
| Defendants. | District Judge David Sam |

## INTRODUCTION

This case came before the Court for a bench trial beginning June 10, 2019. The Honorable David Sam presided. Mark A. Larsen appeared on behalf of the Plaintiffs. Stephen K. Christiansen appeared on behalf of the Defendants.[1]

The parties presented evidence through witnesses and exhibits from June 10-13, 2019, and in subsequent submissions of identified deposition testimony on June 20, 2019. The Court heard live or electronically transmitted testimony at trial from Tracey Baron, David Law, Gretchen Pan, Stephen Medford, Bart White, Darrell Deem, Michelle Baron, Cynthia Morris, Kyle Lattimer, and Rob Hausner. The Court also received identified portions of deposition testimony from Jeff Long and Ronald Stendahl, with accompanying objections to those submissions. (ECF Nos. 287-89.)

---

[1] The parties are referred to generally herein for ease as "Plaintiffs" and "Defendants" regardless whether they are discussed in other capacities, such as a party to the Counterclaim. The Court relies on the pleadings, trial testimony, exhibits, and relevant context for the specifics of which parties are implicated with respect to which claims. Where it is necessary to be specific, these findings and conclusions are specific. Additionally, any final judgment entered in this case will contain specificity as to which precise party is obligated to do what.

The parties then submitted their amended proposed findings of fact and conclusions of law to the Court on September 13, 2019. Having heard the evidence and arguments at trial and having received the parties' written submissions, the Court determined that it was sufficiently apprised such that subsequent argument of counsel would not materially assist the Court in rendering its decision and closing arguments were therefore unnecessary.

Now being fully advised, and for good cause appearing, the Court hereby enters the following findings of fact and conclusions of law in this case pursuant to Fed. R. Civ. P. 52(a)(1).

## **FINDINGS OF FACT**[2]

1. Tracey Baron created a real estate investment model that underlies this dispute. His model centered on the homes of bankrupt debtors with no equity who were going to lose their properties in the bankruptcy. He observed that bankruptcy trustees did not want to deal with the dual hassle of managing debtors' homes during the bankruptcy process and litigating against questionable lienholder assertions at great cost to the estate when there was no equity involved.

2. Mr. Baron purchased the homes outright from them for a nominal agreed amount. The trustee received the benefit of additional cash in the bankruptcy estate in exchange for an asset with no equity that had threatened to cost the estate additional resources to handle. Mr. Baron, meanwhile, received the benefit of a home he could lease to third parties while negotiating or litigating with the lienholders. In exchange for his purchase price, he would receive the benefit of monthly rental income plus the chance to recover equity through a favorable settlement or litigation outcome.

---

[2] The Court's Findings of Fact section is followed by its Conclusions of Law section, *infra*. Despite the labels, the nature of any particular finding or conclusion as such shall be governed by its intrinsic nature and not by how it is labeled or where it appears in either section.

3. For purposes of the transactions at issue in this case, Mr. Baron worked on this model in the Portland, Oregon, area. He undertook his bankruptcy-related efforts in the United States Bankruptcy Court for the District of Oregon (the "Oregon Bankruptcy Court").

4. In 2009, Plaintiff David Law ("Mr. Law") and Defendant Tracey Baron began a long-distance working relationship. Law was buying Utah real property and Baron was operating a short sale negotiation/processing service. A short sale is where the underlying debt secured by a trust deed or mortgage on a residential property exceeded its fair market value, and to resolve the debt, the lender would waive the unsecured balance.

5. From 2009 to 2012, Tracey Baron assisted Law with Law's short sale business in Utah using Mr. Baron's software.

6. In or about 2012, Mr. Baron transitioned from short sales to the bankruptcy-purchase business model described above. He used a variety of lenders to fund the initial purchases. Among these was Mr. Law.

7. Law made his first loan January 30, 2013 and later that year Plaintiff Darrell L. Deem ("Mr. Deem") became involved in financing some of Tracey's purchases of residential properties from bankruptcy trustees for small amounts of money.

8. Law and Deem entered into numerous contracts with different Defendants, which basically consist of two different types of contracts: (i) Joint Venture Agreements; and (ii) two Promissory Notes and a Supplemental Loan Agreement.

9. Initially Mr. Law's relationship with Mr. Baron was profitable. During the years of 2012 to 2013, Mr. Law received significant returns on his investment. He testified that in many cases, he had made 100% to 200% of his money back in 90 days. He and Mr. Baron trusted each other, worked well together, and communicated.

10.     Like Mr. Law, Mr. Deem made loans to Mr. Baron in furtherance of his business model, received significant returns on his invested funds, and trusted Mr. Baron.

11.     Both Mr. Law and Mr. Deem, as well as Mr. Law's wife Janine Law, loaned monies to Mr. Baron's entities both personally and through entities and using their self-directed Individual Retirement Accounts ("IRAs"). Mr. Baron's entities would use the borrowed funds to purchase a property. In exchange, the Law and Deem Plaintiffs would receive an agreed amount of rent proceeds, typically 80%, until their loans were paid back. After that, they would typically receive 20% of rent proceeds until a property sold or was lost to foreclosure. If the property could be financially restructured and then sold, Plaintiffs could get an additional 30% of net profit. The parties initially anticipated that the time from purchase through subsequent short sale of the properties would be one year or less.

12.     The parties' understandings were memorialized in written contracts (the "Loan Transaction Agreements") provided by Mr. Law and Mr. Deem, all of which were with entity Defendants and reflect the same basic terms.

13.     The Loan Transaction Agreements state that they are non-recourse as to the individual partners of the borrowers. The individual Defendants did not sign them and are not parties. The agreements were entered into on behalf of entities. Mr. Baron signed only as managing member on behalf of LLCs. The non-recourse language of the agreements states: "The loan is non-recourse in nature to the individual partners of the Borrower." The "Borrower" in each instance is an entity.

14.     Plaintiffs are Utah residents and companies. The individuals sue on their own behalf and on behalf of their Roth IRA accounts. Defendants are Oregon residents and companies.

**The Steiner Trust**

15. In about 2013, Mr. Baron began adding to some of the Loan Transaction Agreements a guaranty from the Steiner Trust (hereafter sometimes the "Trust"). (*E.g.*, Ex. 12, at 2 ¶ 2.) The Trust was a hereditary family trust whose beneficiary was Gretchen Pan. The Trust was managed by an attorney named Jeff Long as trustee of the Trust.

16. Mr. Long became business partners with Mr. Baron, and Mr. Long represented to Mr. Baron that the Trust was available to guarantee the notes. (T. Baron testimony.) Mr. Long received a 25% interest in one of Tracey Baron's entities.

17. Mr. Baron's entity Big Blue Capital, LLC, now known as RenX Group, LLC (sometimes hereafter "RenX"), entered into agreements with the Trust for credit to back the Loan Transaction Agreements, knowing that the anticipated turnaround time was short and Plaintiffs would never have out more than a few thousand dollars on a deal. (T. Baron testimony; Exs. 1067-68; Deem testimony.) These agreements provided that default for nonpayment to the Trust of any amount due would be declared only after notice and an opportunity to cure were given. (Ex. 1068, at 9 ¶ 6(2).)

18. The weight of the evidence shows that the guaranty added to the Loan Transaction Agreements was not a major factor in the parties' decision to continue entering into the agreements. (T. Baron testimony.) The parties had already been doing deals together for a year and a half without the guaranty and had received substantial returns on their investments. This and the opportunity to continue receiving profits were the principal inducement for them to continue doing the same. (T. Baron testimony; Deem testimony.) This is confirmed further by the fact that the parties entered into multiple agreements after December 3, 2013—the date when RenX was allegedly in default—that did *not* contain the Trust guaranty language. The

undisputed testimony at trial was that Mr. Law and Mr. Deem did not raise any concerns or objections about the omission of the guaranty from those agreements, demonstrating further that the guaranty language was not a principal point of inducement for the plaintiffs. Furthermore, no evidence was introduced that the default had been declared by the Trust against RenX during this time period.

19.     The amount disbursed and outstanding by the Trust did not exceed the amount available under Defendants' agreements with the Trust. (Ex. 256, at 3 ¶ 7; Ex. 1068, at 1.)

20.     In or about 2015, Mr. Baron discovered that Mr. Long had misrepresented the nature of the backing provided by the Trust and had violated his obligations as trustee of the Trust by using funds for his own benefit. (T. Baron testimony.) Consequently, Mr. Baron's attorney Ha Dao wrote a letter to Mr. Long terminating the relationship, and Mr. Baron assisted the Pans in removing Mr. Long as trustee of the Trust. (Ex. 1098; T. Baron testimony.) Mr. Baron then filed a complaint against Mr. Long with the Oregon State Bar. (T. Baron testimony.) Mr. Baron testified without contradiction that he advised Mr. Law of these facts at the time they occurred. (T. Baron testimony.)

21.     On or about May 13, 2015, the Trust declared RenX in default under their agreements, with the entire balance owed to the Trust immediately due and payable. (Ex. 256, at 3 ¶ 8.) Plaintiffs suggested at trial that December 3, 2013 was a key date in connection with the default because the trust alleged in a separate lawsuit against RenX that failure to make a payment occurred on that date. Plaintiffs, however, introduced no evidence of any date, other than May 13, 2015, that notice or an opportunity to cure were given to RenX or that a declaration of default was communicated by the Trust to RenX. Parties associated with the Trust filed suit against Tracey Baron and one of his companies, RenX, with respect to the declared default in

2017. (Ex. 256.) Judgments were entered against Baron and RenX for securities fraud and breach of contract.

22.     After Mr. Baron learned about Mr. Long's mishandling of Trust funds in 2015, and after the Trust declared RenX in default on or about May 13, 2015, the Defendants did not enter into any further Loan Transaction Agreements with the Plaintiffs that contained the Trust guaranty language. (Ex. 171; T. Baron testimony.)

23.     Other than the Oxbow transaction discussed below, no payments on the Loan Transaction Agreements were made by the Defendants to the Plaintiffs after February 11, 2015. The cause of this fact was disputed by the parties at trial. However, as also discussed further below, Plaintiffs received certain rental payments directly from renters after this date.

**Rents that Tracey Baron collected following preliminary injunction**

24.     At Plaintiffs' request, this Court entered a preliminary injunction on January 11, 2018 (the "Injunction"). (Ex. 1084.) Among other things, the Injunction granted Plaintiffs the right to receive rent proceeds from the loan transaction properties.

25.     Exhibit A to the Supplemental Loan Agreement on 52055 Icenogle (Exhibit 135) contains an Assignment of Rents to Lenders.  Trial Trans. p. 101.  The Court's Preliminary Injunction prohibited Tracey Baron from interfering with the collection of rents under this assignment.  Memorandum Decision and Order filed January 1, 2018, (Conclusion, bullet point 3.)  Tracey Baron was aware he was enjoined from interfering with the collection of rents under this assignment. Trial Trans. p. 103.

26.     Plaintiffs took advantage of the rights granted to them by the Injunction to communicate directly with renters and insist they pay rents to the Plaintiffs rather than to Mr. Baron or face eviction, a practice they had likewise engaged in before the Injunction had issued.

(*E.g.*, Exs. 160-63, 1016, 1076.) Regardless of their authorization or intentions in doing so, the result was to exacerbate financial issues with the Defendants rather than resolve them. Most renters either did not know who to pay or took advantage of the parties' disagreement to then not pay anyone the rents that were owed. Consequently, in most cases, neither Plaintiffs nor Defendants received these rent monies. Plaintiffs did receive some rent money, though the amounts and sources were not made clear at trial. As a result, Defendant entities were placed in an even more precarious financial position with less ability to pay Plaintiffs.

27.     Law attempted to contact the tenants on ten of the properties by physically knocking on about 10 doors. He brought a letter from counsel and court documents to let people know it was real.  One of the renters (Exhibit 164) started paying Law and Deem after receiving the assignment of rents.  Law testimony, Day 3, and Exhibit 160.  Prior to that time, they were paying Tracey Baron in cash.  Law testimony, cross-examination, Day 3.

28.     In the course of attempting to direct rents their way, Plaintiffs made statements to third parties impugning Mr. Baron's character. Among other things, they alleged he committed fraud, stole money, could not be trusted, was taking money from others "under the table," and would be going to jail if he acted to "pressure" tenants in any way. (Lattimer testimony; Exs. 164, 1075.)

29.     From the time present counsel for the Defendants entered his appearance in this case forward, Defendants made prompt disclosures to and communicated with Plaintiffs, through counsel, in an ongoing effort to comply with the terms of the Injunction and subsequent orders of the Court entered in response to the parties' pretrial motions seeking clarification and enforcement of the Court's orders. (Exs. 1021-48; Ex. 1097, at 2 ¶¶ 4 & 6.)

30.     In an email dated May 24, 2018, Tracey Baron's attorney stated: "I have the assurance that Tracey will be segregating the rents and they will be held in a separate account. I'll follow-up to make sure that this happens." (Exhibit 1028.) Tracey Baron agreed that this email was correct at the time it was sent. Tracey Baron testimony Day 2. The next day, further assurances were made that the money was being segregated and held in a separate account. Trial Trans. p. 100 & Exhibit 1029. Tracey Baron segregated those funds into a separate account. Trial Trans. p. 99.

31.     After collecting approximately $41,000 and depositing it into a separate account, by July 27, 2018, Tracey Baron withdrew the money from that account and spent it. Trial Trans. p. 100 & Exhibit 1043. Before withdrawing and spending it, he did not ask for permission from anyone to take and spend this money. Tracey Baron Testimony, Day 2, redirect, and Exhibit 1043; Law testimony, Day 3 & Exhibit 1027.

### The Joint Venture Agreement for the Hill Top property

32.     In 2009, Tracey Baron's wife Michelle Baron learned through a friend about a home for rent on Hill Top Avenue in Lake Oswego, Oregon. The home was owned by her friend's father-in-law, Don Olsen. Mr. Olsen became good friends with the Barons and rented the Hill Top home to them. The Barons moved into the property (sometimes hereafter "Hill Top") with their three children and paid Mr. Olsen rent.

33.     The Barons made improvements to Hill Top. Because Mr. Olsen was a close friend, because he was in poor health with a terminal condition, and because the Barons hoped ultimately to purchase the home, the Barons themselves bore the cost of the expenses associated with their improvements.

34.     In late 2013, with Mr. Olsen's health in decline, the Barons discussed purchasing

Hill Top from Mr. Olsen. He agreed to sell it to them for approximately $500,000 despite its

appraised value of $600,000 in recognition of their substantial work on and improvements to the

property.

35.     Mrs. Baron did not have sufficient credit to purchase the Hill Top home.

However, she discussed with Mr. Baron that she would like to purchase it and asked him if he

would help her secure a loan. He said he would. The testimony at trial reflected that Mrs. Baron

was not involved in the finances of the family or the businesses but depended in this area wholly

on Mr. Baron, whom she trusted.

36.     Because of his positive relationship with Mr. Law and Mr. Deem at the time, Mr.

Baron approached them about funding the purchase of Hill Top. The result was a document

entered between the parties titled "Joint Venture Agreement." (Ex. 1.) This document

(sometimes hereafter the "Hill Top Agreement") was signed individually by Mr. and Mrs. Baron,

Mr. Law, and Mr. Deem.

37.     Under the Hill Top Agreement, Mr. Law and Mr. Deem agreed to put up

$496,000 to purchase the property ($248,000 each). Michelle Baron did not contribute any

money for her interest in the Hill Top property.  Trial Day 2.  Any profits were to be split in

accordance with the formula in Paragraph 2 of the JVA. Trial Trans. p. 28. The JVA was not a

loan agreement. Mr. and Mrs. Baron agreed to live in the house and maintain it. The agreement

also called for the parties to attempt to refinance the purchase as soon as possible so that Mr.

Law and Mr. Deem could receive a return of the purchase money they advanced.

38.     Law, Deem and Michelle Baron each received undivided interests in the Hill Top

property pursuant to a Statutory Warranty Deed (Exhibit 251; Trial Trans. p. 21-22), recorded on

December 18, 2013, which grants Michelle Baron an undivided 16.6% Interest, Mr. Law an undivided 41.7% Interest, and Mr. Deem an undivided 41.7% Interest.

39.    To further secure the repayment of the funds they advanced, Mr. Law and Mr. Deem required that the JVA, ¶ 5, include the following:  "The Parties hereby agree that a Warranty Deed is to be prepared by WFG National Title that is to be signed by MBaron in favor of Law and Deem and forwarded to Cornerstone Title to be held in escrow and recorded . . ." in the event of a default "as judged in the sole discretion of Law and/or Deem."

40.    Michelle Baron complied with the ¶ 5 requirement of the JVA to provide a Warranty Deed, but Cornerstone Title lost the deed, making it impossible for Law and Deem to record a copy (Exhibit 250).  At trial, Michelle Baron did not have a problem or issue with signing a replacement Deed.   Michelle Baron testimony, Day 4, cross-examination.

41.    In addition to the agreement regarding the purchase of the property, the Hill Top Agreement anticipated the parties' subdividing the large parcel of land on which the home sat and selling off those lots. Anticipated profits from that venture were to be split 70-15-15 between Mrs. Baron, Mr. Law, and Mr. Deem respectively. (Ex. 1, at 1 ¶ 2.) The parties received estimates that the engineering required for the partitioning and development would cost approximately $100,000.  In the Hill Top Agreement, Mr. Law and Mr. Deem agreed that they would pay up to $110,000 toward expenses to improve the property, but no more. The relevant paragraph reads:

> Law and Deem are required to contribute no more than $110,000 towards
> development and partitioning of the anticipated three additional lots. Any amounts
> required in excess of $110,000.00 shall be the responsibility of MBaron and TBaron.

(Ex. 1, ¶ 3k.)

42. Plaintiffs communicated almost immediately that they did not intend to put any money toward developing or partitioning Hill Top, and then they in fact did not do so.

43. Paragraph 3(v) of the JVA contains the following requirement: "MBaron and/or TBaron must obtain prior written authorization from Law and Deem before expending more than $2,500.00 on any single expenditure of the 18901 Venture." Mr. Baron spent a total of $126,328 in expenses toward developing the property. These expenses included, among other things, application to the City of Lake Oswego, engineering expenses with 3J Engineering, and surveying. There are no written requests for approval of expenditures, nor are there any approvals from both Law and Deem for such expenditures. Trial Trans. p. 32.

44. Paragraph 10 of the JVA also contains the following requirement: "A Party incurring any expense on behalf of the 18901 Venture shall notify the other Parties of the nature and amount of the expense within a reasonable time before the expense is incurred."

45. JVA ¶ 10 also states that "expenses of the 18901 Venture shall be advanced by the Party incurring those expenses and shall be reimbursed based upon proper documentation at such time as the expenses of the 18901 Venture are paid by the various Part(ies) . . . ."

46. There is no evidence of prior written authorization before expending more than $2,500 on any single expenditure or any written request to draw on the $110,000. Although Tracey Baron knew of the requirement to have written approval in advance of any expenditure exceeding $2,500, he admits that he did not obtain any written approval. Trial Trans. pp. 55-56.

47. Defendants paid Plaintiffs $2,500 per month in connection with the Hill Top Agreement, from the time they moved into Hill Top in 2013 until May 2015, including after Plaintiffs had communicated their intent not to pay any amount toward the expenses of developing the property. (T. Baron testimony.) These payments, totaling $45,000, were mortgage

payments and/or interest under the Hill Top Agreement to Plaintiffs as lenders. (T. Baron testimony; Law testimony; Ex. 1, at 2 ¶ 3.q.)

**The "No Lien" Provision of the JVA**

48.    Paragraph 3(g) of the JVA contains a "no lien" provision. It states: "**Any Party who violates this subparagraph hereby expressly releases their profits and/or interest in the subject property in favor of the remaining Parties.**" (Bold in original). Trial Trans. p. 44

**a. The Oregon Claim of Construction Lien**

49.    On January 20, 2016, Tracey Baron recorded an Oregon Claim of Construction Lien (Exhibit 249) against the Hill Top property in the sum of $169,133.34. The Construction Lien asserts that (i) the claimant is Baron Construction and Development; and (ii) Law and Deem hired Baron Construction and Development. Trial Trans. p. 48. At the time, Tracey Baron owned all the shares of Baron Construction and Development. Trial Trans. pp. 48-49. He was an officer and director of that corporation. Trial Trans. p. 49. Tracey Baron submitted an expense report but failed to provide an itemized list of his expenses.

50.    While living in the Hill Top property for over four years, Michelle Baron did not see any construction on the property. The only thing she observed were blueprints, a survey and some bids. Michelle Baron testimony, Day 4.

51.    Law and Deem were unaware that Baron Construction was doing any work on the Hill Top property. They did not hire Baron Construction. When Law and Deem took control of the Hill Top property December 30, 2016, there was no evidence of over $100,000 in improvements. The property was run down and dirty, requiring Law to spend $15,000 to make very basic repairs and major cleaning. Law testimony, Day 3.

52.     As noted above, Law and Deem never received any request in writing or any proper documentation to draw on the $110,000.  They never received an oral request.  Law testimony, Day 2 & 3; Deem testimony, Day 4. The first time Law was aware of a claim that Tracey Baron had attempted to draw on the $110,000 was in a bankruptcy proceeding.  Law testimony, Day 2 & 3.

**b. Unpaid property taxes resulting in liens against Hill Top**

53.     Under the JVA, Michelle Baron & Tracey Baron were to occupy the house and were responsible for paying the mortgage, interest (JVA ¶ 3(q)) and taxes and insurance (JVA ¶ 3(r)).

54.     Michelle Baron & Tracey Baron were obligated under JVA ¶ 3(r) to pay the property taxes.  They defaulted on these obligations. Trial Trans. p. 37.  The unpaid property taxes on the Hill Top property follow:

| Fiscal Year | Amount (plus interest, if any) |
|---|---|
| 2015 | $ 9,926.02 |
| 2016 | $ 9,202.05 |
| 2017 | $ 8,931.44 |
| 2018 | $ 8,035.75 |
| Total | $36,095.02 |

(Exhibit 264; Trial Trans. p. 34).

55.     The failure to pay the property taxes on the Hill Top property resulted in liens being filed against the property.  Trial Trans. pp. 44-45 & Exhibit 273.  See, JVA ¶ 3(g) (no liens provision).

56.     Foreclosure proceedings were scheduled to begin if the 2015 property taxes were not paid in full before June 17, 2019.  (Exhibit 264).   As a result, just before the trial in this case,

Law paid the 2015 property taxes to avoid foreclosure on the Hill Top property.  Law testimony, Day 3 & Exhibit 264.  Past due property taxes accrue interest at the rate of 16%.  Id.

57.     To prevent foreclosure, Tracey Baron paid the 2013 property taxes. He did not pay the 2014 property taxes.

### c.  State and Federal Income Taxes Resulting in Liens on Hill Top

58.     As reflected on her Bankruptcy Schedules, Michelle Baron failed to pay state income tax in the sum of $133,000, resulting in a lien by the State of Oregon against the Hill Top property in that amount.  She also failed to pay federal income tax of $375,045, resulting in an IRS lien against Hill Top in that amount.

### d.  The Barons Failed to Maintain Insurance on the Hill Top Property

59.     Paragraph 3(r) of the JVA states that "TBaron and MBaron are to pay for taxes and insurance" on the Hill Top property, and that "Law and Deem are to be named additional insureds on the insurance policy."  Tracey Baron cancelled the insurance coverage for Law and Deem and kept himself insured on the property. When David Law found out that they were not covered, he started paying insurance in December of 2015, paying a total of $2,396.77.  David Law also paid a total of $13,145.56 in taxes to hold off foreclosure due to Tracey Baron not paying taxes.  David Law paid a total of $15,541.77 that should have been paid by the Barons under the JVA.  Exhibit 304.

60.     Paragraph 4 of the JVA states in part, "No Party to this Agreement may further assign and/or divide its own participation on the 18901 Venture with a third party without the written consent of all other Parties. . . ."

61.     Without Deem's or Law's consent, Michelle Baron transferred her interest in the real property (Exhibit 253) to a limited liability company, Turning Leaf Homes V, LLC, which

then filed bankruptcy. Michelle Baron admitted she did not ask for Law or Deem's consent prior to signing this Deed. Michelle Baron testimony, Day 4, cross-examination.

62. Paragraph 16 of the JVA entitles the prevailing party in any dispute over the JVA to recovery attorney fees and costs.

**Defendants' failure to pay rent on Hill Top**

63. Tracey and Michelle Baron signed a Residential Lease Agreement backdated to December 15, 2013 (Exhibit 263) requiring them to pay rent on the Hill Top property to DJ Property Solutions (David Law) $2,500 a month. Trial Day 2. The parties anticipated that Tracey and Michelle Baron would either obtain permanent financing requiring payments of $2,500 per month or pay rent of $2,500 a month. Michelle Baron acknowledged that after she received her interest in Hill Top (Exhibit 251), she intended to continue paying rent. Michelle Baron testimony, Day 4, cross-examination. No one agreed that the Barons could live in the Hill Top property rent free.

64. The Barons paid $2,500 per month from January 2014 – May 2015. Trial Trans. p. 38. Law testimony, Day 2. They moved out of the Hill Top property in February of 2015. Trial Trans. p. 38. They were not forced out of the property. Tracey told Michelle Baron that there was going to be construction and that they needed to leave during construction. Michelle Baron testimony, Day 4.

65. On March 1, 2015, Tracey Baron rented the Hill Top house to a third party, Cynthia Morris, until she moved out on December 24, 2017. Trial Trans. p. 39. He did not inform Law or Deem they were renting the Hill Top property to Morris. Law testimony, Day 2.

66.	There is no provision in the JVA authorizing Michelle and Tracey Baron to rent the Hill Top property to a third-party. Trial Trans. p. 40. Additionally, there is no provision in the lease with DJ Property Solutions to sublet the property to a third party. Exhibit 263, page 2, paragraph. 5.

67.	Michelle and Tracey Baron failed to distribute the $6,000 Morris paid as rent in accordance with paragraph 2 of the JVA.

68.	In April 2017, Plaintiffs took control of the property and began themselves renting out the property for $2,500, which monthly amount decreased six months before trial to $2,250, for a total of $63,500 by the time of trial. (Law testimony.)

69.	Tracy and Michelle Baron did not pay Law and Deem rent on the Hilltop property in the amount of $2,500 a month from May 2015 to April 2017 (when Plaintiffs began renting it out themselves), for a total of $57,500.

**The Fite Bankruptcy**

70.	Tracey Baron was aware that this court's Preliminary Injunction was issued. On the Conclusion page of the Preliminary Injunction, the Court states: "Defendants are enjoined from transferring any parcel of real estate named in the agreements of the parties . . . without either the agreement of counsel or leave of the Court."

71.	Tracey Baron understood that this injunction included Hill Top and the JVA. Trial Trans. p. 62.

72.	Paragraphs 4 & 5 of the JVA prohibited Michelle Baron from transferring title to a third party without the consent of Law and Deem. Law testimony, Day 3.

73.     Contemporaneously with the signing of the JVA on December 17, 2013, Michelle Baron signed and delivered a deed to Deem and Law for her 16.7% interest in Hill Top.  Exhibit 250.  This deed was to be recorded in the event of a default.  Trial Trans. pp. 64-65.

74.     On May 30, 2017, Michelle Baron transferred her 16.7% interest in Hill Top to Turning Leaf Homes V, LLC. Exhibit 253.  (Tracey Baron merged Turning Leaf Homes V into FITE, LLC, effective as of January 3, 2018).  Trial Trans. p. 66 & Exhibit 254.)

75.     Because FITE—which had title to the Hill Top property from May 30, 2017 to May 8, 2018—had no responsibility for Michelle Baron's personal income tax returns, FITE did not cause any liens for failure to pay income taxes to be filed against the property.  The title was clear except for past-due property taxes.  Trial Trans. pp. 69-70.

76.     On January 5, 2018, when FITE, LLC, filed for bankruptcy (Exhibit 317), Michelle Baron's 16.7% interest in Hill Top had been transferred to FITE.  Trial Trans. p. 62.  This bankruptcy petition was filed six days before the Court entered its Preliminary Injunction.  *Id.* It was filed after the Motion for Preliminary Injunction had been briefed and argued.  *Id.*  The filing of the petition placed Michelle Baron's 16.7% interest in Hill Top into the hands of a bankruptcy court.  Trial Trans. p. 64.  The FITE bankruptcy schedule, however, does not list the Hill Top property as an asset.  Exhibit 318, Part 9 ¶ 55.  Tracey Baron signed the FITE petition under penalties of perjury.  Exhibit 318 p. 1.

77.     Law and Deem were opposed to the filing of the FITE bankruptcy (Exhibit 318; Trial Day 2, Tracey Baron testimony).

78.     Judge Trish M. Brown was assigned to the FITE bankruptcy in Oregon.  In a letter opinion dated April 30, 2018, Judge Brown explains her reasoning in dismissing the FITE bankruptcy and in issuing a two-year prohibition against Tracey Baron and any entity in which

he holds an interest from filing a petition in bankruptcy. Trial Trans. 67 & Exhibit 174. Judge

Brown found that Tracey Baron committed gross mismanagement of the estate, breached his

fiduciary duties, violated a court order, failed to file and report and filed the Petition in bad faith.

"Mr. Baron has proven himself utterly incapable of subordinating his own personal interests to

the best interest of the bankruptcy estate." Pages 4 & 5 of the Letter Opinion. He could not

account for the tenant security deposits and, because the accounting was too difficult, refused to

collect additional security deposits. He failed to account for post-petition rents paid in cash.

79.    Judge Brown also found that "Mr. Baron and his wife collectively own 100% of

TLM ("Turning Leaf Management, Inc. "). . . .  Although TLM appears to conduct some

business activities on behalf of Mr. Baron's various LLCs, it also serves as a source of funding

for Mr. Baron's personal lifestyle: he testified that he does not have a personal bank account, and

that he pays his personal expenses from TLM's assets. . . ." Exhibit 174, page 2 of 9 (citations

omitted).

80.    Judge Brown reached the following conclusion:

> Bankruptcy is a powerful tool, which can only function properly if parties are honest
> and forthright with each other and the court. In return for the benefits conferred upon
> debtors, the Bankruptcy Code and Rules impose reporting duties that are designed to
> facilitate adjustment of the debtor-creditor relationship by providing salient
> information to interested parties. *See Cossio v. Cate (In re Cossio)*, 163 B.R. 150,
> 156 ("Interested parties should be entitled to rely on the information provided in the
> course of the bankruptcy case."). A "debtor may not accept the benefits conferred by
> the code and reject its burdens." *In re Haverland*, 150 B.R. 768, 772 (Bankr. S.D.
> Cal. 1993). Yet this is exactly what **Mr. Baron** seeks to do: he wants to unlock value
> in his entities' assets, but he **refuses to deal honestly with creditors**. This must stop.
> At this point, after the fifth petition involving one of his entities, Mr. Baron has had
> so many bites at the proverbial apple that there is nothing left but the core. **Because
> of Mr. Baron's mismanagement of the estate and failure to fulfil the Debtor's
> duties in bankruptcy, I hold that dismissal of this case with a two-year bar to
> refiling is justified**. . . .

(Emphasis added.)

81.     On May 8, 2018, Judge Brown entered an Order of Dismissal of the Fite bankruptcy.  Exhibit 175.  *See* Trial Trans. pp. 68-69.

**Mrs. Baron's Bankruptcy**

82.     In June 2018, Mrs. Baron filed a Chapter 7 bankruptcy petition in the Oregon Bankruptcy Court. (Ex. 247.) This bankruptcy petition was filed six days before the Court entered its Preliminary Injunction.  Id. It was filed after the Motion for Preliminary Injunction had been briefed and argued.  Id.

83.     Although the FITE bankruptcy schedule does not list the Hill Top property as an asset (Exhibit 318, Part 9 ¶ 55), Tracey Baron, on behalf of FITE, signed a deed transferring the Hill Top property from FITE to Michelle Baron.  Trial Trans. 70 & Exhibit 252. This deed was recorded on June 21, 2018, at 9:12:53, (*Id*.), just four minutes before Michelle Baron filed bankruptcy on June 21, 2018, at 9:16 a.m. (Exhibit 247).  Trial Trans. pp. 71-72. Tracey Baron testified that he knew he was enjoined from transferring title to the Hill Top property but did it anyway:

> Q. And you transferred an interest in the Hill Top property after you knew that you were enjoined from transferring any interest in the Hill Top property?
>
> A. Yes.
>
> **Q. You violated the court's preliminary injunction, didn't you?**
>
> **A. Yes.**

Trial Trans. p. 71 lines 6-12 (emphasis added).

84.     Tracey Baron understood in advance that transferring the deed from FITE, which was out of bankruptcy, to Michelle Baron would cause liens for her unpaid income taxes to

attach to the Hill Top property. Trial Trans. p. 74 lines 5-10. Trial Day 2, Tracey Baron testimony. In Exhibit 255, in Michelle Baron's bankruptcy schedules, Section E/F, the IRS's claim is for $375,045 and the Oregon Department of Revenue's claim is for $112,712. Michelle Baron testimony, Day 4. Tracey and Michelle Baron have not filed income taxes for years. *Id.*

85.     Tracey Baron knew that to clear title Deem and Law would have to pay Michelle Baron's unpaid income taxes. Trial Trans. p. 74 lines 18-23. On this topic, Tracey Baron testified,

> Q. So you knew that signing the title and recording it was a violation of the court's preliminary injunction and the consequence of that is that there are now half a million dollars of liens against the property, right?
>
> A. Yes.

Trial Trans. pp. 74-75 lines 24-25 & 1-3. He also understood that if FITE kept the title, there would be no income tax liens on the Hill Top property. Trial Trans. p. 75.

88.     The fourth bullet point in the Conclusion section of the Preliminary Injunction (Exhibit 1084) states: "Plaintiffs shall be given access to files, documents, surveys and all work performed or in the process of being performed or in the possession of the engineering firm of 3J Consulting relative to the 18901 Venture (Hill Top Project). Plaintiffs are allowed to use all existing documentation to perform any work needed to preserve the value of said asset and the funds expended in furtherance thereof. . . ."

89.     Law and Deem received the documents from 3J Consulting. Law testimony, Day 3, cross-examination.

90.     Law and Deem asked Baron and 3J to allow them to complete the Hill Top project but Baron would not allow them to do so. Deem testimony, Day 4.

91.     Because the application to the city for the subdivision of Hill Top into three lots was not completed on time, the entire process had to be started over, impairing 3J's work.  Id. See Exhibit 1063.

92.     The Hill Top property is currently identified as an asset in Mrs. Baron's bankruptcy. (Ex. 255, Sched. A/B, at 7 ¶ 1.2.) The bankruptcy court supervising Mrs. Baron's case entered an order lifting the stay in her proceedings for the limited purposes of determining claims in this case as set forth in that order. (Ex. 246.) The order lifting the stay provides in relevant part:

> Creditors [i.e., Plaintiffs in the instant case] are granted relief from the automatic stay for cause so that they may proceed with trial . . . in the United States District Court for the District of Utah, Case No. 2:15-CV-755-DS and the Honorable David Sam can determine: (1) liabilities and ownership interests in the real property located at 18901 Hill Top Road, Lake Oswego, Oregon 97305 . . . under a Joint Venture Agreement dated December 16, 2013; and (2) liability for the conversion, breach of fiduciary duty and fraud claims. . . .

(Ex. 246, at 3 ¶ 9.)

93.     As implementing the business model progressed, Mr. Baron experienced difficulties with cash flow. There was a dispute in the evidence presented about the cause of the difficulties. Mr. Baron advised Mr. Law and Mr. Deem that he would need to modify payments on those parties' investments, to which they agreed.

94.     Other than the Oxbow transaction discussed below, no payments on the Loan Transaction Agreements were made by the Defendants to the Plaintiffs after February 11, 2015. The cause of this fact was disputed by the parties at trial. However, as also discussed further below, Plaintiffs did receive certain rental payments directly from renters after this date.

**The Oxbow transaction**

95.     The Loan Transaction Agreements included the provision that, if and when a property sold, Mr. Baron's companies would receive reimbursement of their costs expended, and the parties would split the remaining profit. In late 2015, Mr. Baron prepared to sell his first Oregon property, known as "Oxbow." As the Oxbow closing approached, a dispute arose between the parties.

96.     Tracey Baron refused to close Oxbow. Trial Trans. p. 130 & Exhibit 147. He threatened criminal charges unless Deem and Law conceded to his demands. Exhibit 154 & Trial Trans. pp. 143-45; Exhibit 157 & Trial Trans. pp. 147-48.

> Q. Okay. But you were accusing them of mortgage fraud, you are accusing them of racketeering, you are accusing them of tax evasion, you are accusing them of white collar crimes, you're accusing them, in the course of this negotiation, of committing felonies, right?
>
> A. I did.

Trial Trans. p. 145 (lines 5-10).

97.     In the course of negotiating the closing of the Oxbow property, and the amount of money Deem and Law would receive from that closing, these criminal threats resulted in Deem and Law waiving the amounts due them under the Supplemental Loan Agreement on Oxbow (Exhibit 6), 30% of the net proceeds as indicated in the HUD-1 Settlement Statement (Exhibit 1091). See Exhibit 1013.

98.     Law and Deem both signed releases of their rights to this $18,494.40. Exhibits 167 & 168.

99.     The day before the Oxbow closing, Plaintiffs filed this suit against Defendants in this Court. (T. Baron testimony; ECF No. 1.)

100.    The Oxbow transaction and accompanying lawsuit represented a significant turning point in the parties' relationship. They marked the end of any amicable relations between the parties, which were replaced instead by substantial mistrust, distrust, bickering, and disputed conduct moving forward thereafter.

101.    At trial, Mr. Baron acknowledged he said things in the heat of the moment, then and later, that he now regrets, and feelings between the parties remained particularly tense and bitter. Even so, time has given Mr. Baron cause to reflect, and he apologized at trial for the tone and content of his personal statements directed against the Plaintiffs.

## Conclusions of Law

1.  Plaintiffs filed this lawsuit and Defendants filed counterclaims. Plaintiffs' governing affirmative pleading is the Third Amended Complaint (ECF No. 124), which Defendants answered (ECF No. 152). The governing affirmative pleading for Defendants is the Counterclaim (ECF No. 87), which was appended to an earlier Answer (*id.*; *see* ECF No. 152, at 16), and which Plaintiffs answered (ECF No. 92).

2.  There are numerous claims, defenses, counterclaims, and other issues between the parties. The trial of this matter and the Court's resulting findings of fact and conclusions of law reached herein resolve all claims between all parties in this case.

3.  Plaintiffs' claims are each resolved as discussed in the paragraphs that follow.

4.  **Accounting.** Plaintiffs' First Cause of Action seeks an equitable accounting. (ECF No. 124, at 5-6.) However, no rights arise in favor of the Plaintiffs in equity unless they lack an adequate remedy at law. The parties agree that Utah state legal principles would govern this determination. "It is settled in Utah that 'the law will not imply an equitable remedy when there is an adequate remedy at law.'" *Thorpe v. Washington City*, 2010 UT App 297, ¶ 28, 243 P.3d 500 (quoting *UTCO Assocs., Ltd. v. Zimmerman,* 2001 UT App 117, ¶ 19, 27 P.3d 177, *cert. denied,* 32 P.3d 249 (Utah 2001)). Here, Plaintiffs' breach of contract claim remained viable at trial. Plaintiffs therefore have not demonstrated that they lack an adequate remedy at law such that this Court need resort to use its equitable powers as requested here. The accounting claim is unnecessary and nonviable since comparable legal claims sounding in contract were presented at trial addressing all monies alleged to be owed. This is first and foremost a contract case. This equitable claim is hereby denied and dismissed.

5.  **Breach of Contract.** Plaintiffs' Second Cause of Action alleges breach of contract

under the Loan Transaction Agreements and the Hill Top Agreement. (ECF No. 124, at 6-7.) Defendants' Second Claim for Relief also alleges breach of contract regarding the Hill Top Agreement. The court will consider these claims together. These claims are advanced under Utah law, which the parties agreed would govern their contract disputes. (*E.g.*, Ex. 3, at 2 ¶ 12; Ex. 1, at 7 ¶ 16.) The elements of a Utah contract claim include proving: "(1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages." *Am. W. Bank Members, L.C. v. State*, 2014 UT 49, ¶ 15, 342 P.3d 224 (citation and quotations omitted). The Court hereby concludes as follows with respect to each element of the two groups of transactions at issue in this case (the Loan Transaction Agreements and the Hill Top Agreement) in the following numbered paragraphs.

### ***The Loan Transaction Agreements***

6.      ***Contract.*** This element is met by the existence of the Loan Transaction Agreements.

7.      ***Performance by the Plaintiffs.*** This element is met.

8.      ***Breach by the Defendants.*** Only the entity Defendants are parties to the agreements. The individual Defendants are not liable for any breach of the agreements, per the plain language of the agreements. Nor are all Defendants parties to all of the contracts. As discussed further hereafter, Plaintiffs failed at trial to distinguish which entity Defendants were tied to which agreements when presenting their damage claims.

9.      ***Damages.*** There are a number of issues with Plaintiffs' damages that preclude an award of damages as Plaintiffs have requested. These will be discussed in the following paragraphs.

10.     *First*, Plaintiffs have not proven their damages with sufficient certainty. Under Utah contract law, "[d]amages are only recoverable for loss in an amount that the evidence proves with reasonable certainty, although the actual amount of damages need not be proved with precision. Any alleged damages which are only remote, possible or a matter of guess work are not recoverable." MUJI 2d CV2140 (collecting cases). As laid out further hereinafter, Plaintiffs' alleged damages suffer from a serious lack of reasonable certainty on the evidence presented.

11.     *Second*, Plaintiffs have not allocated their damages appropriately to any particular Defendant. The entity Defendants are the signatories on the Loan Transaction Agreements. However, not all Defendants are a party to every agreement. Plaintiffs made no effort at trial to distinguish between Defendants when presenting their damages. Rather, they called as a witness Mr. Bart White, an accountant, who presented alleged damages on an aggregate basis. Such aggregate damages clearly cannot and should not enter against all the Defendants or even all the entity Defendants. In the absence of an evidentiary foundation for assessing damages against any particular Defendant on the loan transactions, the Court would be required to engage in guesswork of the sort prohibited by the law of damages, which cannot sustain a judgment. The Court therefore concludes that Plaintiffs have failed to demonstrate damages as required by Utah law as an element of their claim and declines to award them under the Loan Transaction Agreements.

12.     *Third*, Plaintiffs' designated damages witness did not provide a sufficient evidentiary basis on which to award all the damages the Plaintiffs are claiming. Plaintiffs catalogued their alleged damages at trial principally through Mr. White and five documents,

Exhibits 300 through 304. The Court finds significant issues with the presentation of Plaintiffs' damages, as discussed next.

13.     First, the Court finds Mr. White not to be credible as an expert witness and not to have brought any particular expertise to bear in discussing damages. "[E]xperts may not merely parrot or recite factual evidence, without offering a valid expert opinion based on such evidence; nor may they attempt to lend credibility, as experts, to certain evidence relevant to disputed issues of fact." *In re Universal Serv. Fund Tel. Billing Practices Litig.*, No. 02-MD-1468-JWL, 2008 WL 4382141, at *4 (D. Kan. Sept. 26, 2008) (unpublished) (citing *Ash Grove Cement Co. v. Employers Ins. of Wausau,* 246 F.R.D. 656, 661, 663 n.5 (D. Kan. 2007)). Yet that is all Mr. White did. He presented Exhibit 300, which was a spreadsheet purporting to state Plaintiffs' damages. Under cross-examination, however, he acknowledged that he did no more than compile numbers that were given to him by the Plaintiffs themselves, which are reflected in Exhibits 301-02. While he was certainly entitled to "identify the factual bases for the assumptions" underlying his testimony," and "render[] economic opinions based on those assumptions," *see id.*, that is not what he did. He did no more than create a spreadsheet. Furthermore, he had no personal knowledge of the bases for the numbers that were given him – which were themselves a summary – and he did not review the underlying documents or information from which the Plaintiffs purported to derive their numbers.

14.     Additionally, Mr. White testified that the Defendants "refused to cooperate" with him in providing information, yet admitted the following on cross-examination: (a) that he had never requested information from Defendants or their legal counsel in the prior year before trial; (b) that he had never asked for and been denied information directly by the Defendants or their legal counsel; and (c) that he had actually reviewed information voluntarily provided by the

Defendants through their legal counsel in the course of this litigation. He did not know the meaning of terms appearing on his own spreadsheet, such as "RCLM." (Ex. 300.) And he did not actually analyze rents collected, thereby disregarding testimony from the principal witnesses on both sides of the transactions that the parties' course of conduct was to pay on the contracts from rents actually received and that foreclosure would end payment obligations – a fact reflected further in the Loan Transaction Agreements themselves. (*E.g.*, Ex. 12, at 9.) His testimony lacks credibility under these circumstances.

15.      In addition to the foregoing, Mr. White provided no "specialized knowledge" that would "help the trier of fact to understand the evidence or to determine a fact in issue," *see* Fed. R. Evid. 702(a), nor did he demonstrate the other grounds identified for recognizing his testimony as within the purview of an expert, *see id.* 702(b)-(d). Moreover, he did not have personal knowledge of the facts to which he testified, entitling his testimony to no weight as a lay fact witness, as opposed to an expert. *See* Fed. R. Evid. 602 (setting forth personal knowledge requirement for fact witnesses). The Court gives his testimony no weight.

16.      The Court further finds that the underlying documentation provided by the Plaintiffs itself has issues that make it difficult if not impossible for the Court to rely on any such documentation in making a damages conclusion. The Plaintiffs did no more than put conclusory summaries into evidence. (Exs. 300-04.) They did not provide a knowledgeable fact witness to discuss the same nor to answer questions on either direct or cross-examination. Nor are these exhibits summaries of testimony given in the trial nor shown to be summaries of voluminous documentation otherwise provided to the Defendants. *See* Fed. R. Evid. 1006. Mr. Law was the only one of the Plaintiffs to testify in their case-in-chief, and he spent no time in his testimony educating the Court on the Plaintiffs' alleged damages or otherwise establishing the amount,

grounds, calculations, or bases therefor. Thus the sum and substance of Plaintiffs' damages calculations, as presented to the Court, are sheets with numbers on them, which is an inadequate foundation on which this Court may rest a decision.

17. Significantly, Plaintiffs provided no underlying documentation or testimony supporting the categories or their calculations or conclusions, and they failed to present any evidence to the Court to demonstrate they took into account rents received or, if so, how much, in a way that could be examined by the Court and cross-examined by the Defendants.

18. At no time have the Plaintiffs categorized for the Court or the Defendants which entity Defendants are alleged to owe what to whom. There are multiple Plaintiffs and Defendants in this case. While the Plaintiffs' Exhibits 300 to 302 identify the Plaintiffs and the entity Defendants alleged to be involved, and while the Court has in evidence the underlying contracts themselves (Exs. 2-144), Plaintiffs have not tied their damage claims to those contracts with any degree of particularity that would allow the Court to assess whether a particular entity Defendant should be responsible for the amount alleged. Nor could Mr. White answer this question when put to him. Rather, Plaintiffs simply lay claim to amounts of damages and appear to assert that all Defendants are responsible for all of their damages. Such an approach ignores the law of contracts and the requirements of proving damages. The Court will not simply take numbers and apply them to impose damages against a Defendant who has not been shown to owe any such amount.

19. For these reasons, the Court cannot find that Plaintiffs are entitled to damages as they request in their Exhibit 300.

20. Nevertheless, the Court does not find that the Plaintiffs suffered *no* damages. Rather, in the interest of justice, the Court finds that the Plaintiffs would be entitled to the return

of the principal amounts they claim are due – $91,475.96 for the Law parties, and $61,828.46 for the Deem parties (Ex. 300). Defendants have stipulated to this in their amended proposed findings and conclusions submitted after trial. The Court finds based thereon that the Plaintiffs would be individually entitled to their respective "Principle [sic] Due" amounts shown on Exhibit 300. The entity Defendant responsible for paying its portion of this amount shall be identified jointly by the parties from the evidence in preparing and submitting a proposed final judgment implementing the Defendants' stipulation. The Court bases this damages ruling not on the evidence at trial, which is lacking for this Court to make any such determination, but only from the Defendants' offer to stipulate as much in their amended proposed findings and conclusions submitted after trial.

21.     Law and Deem are entitled to a Judgment against Tracey Baron for the $41,000 Tracey collected pursuant to the agreement of counsel following the preliminary injunction.  In Exhibit 1028 (an email dated May 24, 2018), Tracey Baron's attorney stated: "I have the assurance that Tracey will be segregating the rents and they will be held in a separate account and follow-up to make sure that this happens." Trial Trans. p. 99. Tracey Baron agreed that this email was correct at the time it was sent.  Tracey Baron testimony Day 2.  The next day, further assurances were made that the money was being segregated and held in a separate account.  Trial Trans. p. 100 & Exhibit 1029.  Tracey Baron segregated those funds into a separate account. Trial Trans. p. 99.

22.     After collecting approximately $41,000 and depositing it into a separate account, by July 27, 2018, he knowingly violated this court's Preliminary Injunction by withdrawing it from that account and spending it.  Trial Trans. p. 100 & Exhibit 1043.  Before withdrawing and spending it, he did not ask for permission from anyone to take and spend this money.  Tracey

Baron Testimony, Day 2, redirect, and Exhibit 1043; Law testimony, Day 3 & Exhibit 1027. He did not have authority to withdraw money from the separated account.

23.    No other damage items claimed by the Plaintiffs as shown on their Exhibit 300 have been proved to the Court's satisfaction by a preponderance of the evidence, which was the Plaintiff's burden to bear. The Court finds numerous problems with the Plaintiffs' other numbers on this exhibit, in addition to those already outlined, including the following:

24.    Plaintiffs' "Rents Due" were determined based on simply applying the promissory note amounts, with no apparent analysis of rents actually being received or whether the property was in foreclosure; with no apparent regard for all provisions in the Loan Transaction Agreements; and with no accompanying testimony of sufficient quantum and quality to satisfy the Court of the evidentiary foundation on which the damage claim rests. The Loan Transaction Agreements contain conflicting provisions regarding different fixed repayment amounts versus percentage payment amounts based on rents received. (*Compare, e.g.*, Ex. 10, at 1 n.2 *with* Ex. 11, at 1 ¶ 2 *and* Ex. 12, at 1 ¶ 1.) Any such conflict is readily resolved, however, by the virtually unanimous parol evidence and by the parties' course of conduct demonstrating the Plaintiffs were to be paid a percentage of rents, and only if rents were received. *See Daines v. Vincent*, 2008 UT 51, ¶¶ 24-37, 190 P.3d 1269 (parol evidence and course of conduct appropriate to resolve facial contractual ambiguity regarding parties' intent). Plaintiffs have not demonstrated to the Court's satisfaction, however, that they performed any such analysis with respect to the numbers they present in Exhibit 300. The only witness speaking to this exhibit, Mr. White, did not know what numbers were used or how they were calculated. He simply compiled Plaintiffs' end conclusions. Most importantly, however, the Plaintiffs did not put on evidence at trial that any of the Defendants actually received these rents from tenants, and certainly not in the

significant amounts asserted by Plaintiffs on their Exhibit 300 ($606,868.20). Plaintiffs can point to no credible evidence received at trial substantiating any such number. Their own documents they created (Exhibits 301-02) are not backed by any expert, lay, or documentary evidence, but are simply presented to the Court with numbers. Given that Plaintiffs bear the burden of proof on their alleged damages, this is insufficient for the Court to base a large, six-figure "Rents Due" damage claim as Plaintiffs allege.

  25. Plaintiffs' "Interest Due" calculations likewise suffer from fatal deficiencies. The Loan Transaction Agreements provide only for simple interest in the event of a default. (*E.g.*, Ex. 9, at 2 ¶ 3.) Before default, there is a compound interest rate, but at a significantly lower rate (6% per annum) than what the Plaintiffs have used in their calculations (1.5% per month). (*Compare, e.g.*, Ex. 7, at 1 ¶ 1 *with* Ex. 303.) Plaintiffs, however, have purported to use some form of compounding interest for all rents. (Exs. 301-03.) They have, moreover, used the default rate throughout their calculations (1.5% compounded monthly) without showing to the Court with evidence that it applies throughout their calculations.

  26. Furthermore, the compounding formula Plaintiffs have used (Ex. 303) has not even been shown to be a correct compounding interest formula – in fact, it appears on its face to be incorrect – and no witness was provided to speak to the use or application of the formula. Plaintiffs begin interest in the first month without an explanation as to how or why that would be proper. (Ex. 303.) They then appear to apply such formula to not only "compound" but "multiply" interest, such that *three* months of interest are due in month two, *six* months of interest are due in month three, and so forth. (Ex. 303.) Nor have Plaintiffs provided a starting point for such interest as it would apply to the various principal and alleged rent items to which

Plaintiffs purport to apply it. Given their failure of proof on this point, the Court declines to award interest.

27. The federal trial courts have discretion whether to award prejudgment interest, even when sitting in diversity and applying state law. *See AE, Inc. v. Goodyear Tire & Rubber Co.*, 576 F.3d 1050, 1055 (10th Cir. 2009); *U.S. Indus. v. Touche Ross & Co.*, 854 F.2d 1223, 1255 & n.43 (10th Cir. 1988), *overruled on other grounds as recognized by Dullmaier v. Xanterra Parks & Resorts*, 883 F.3d 1278, 1295 (10th Cir. 2018). The Tenth Circuit has noted that Utah law has allowed prejudgment interest "calculated from the date the claim was filed" in contract cases, in a number of situations. *AE, Inc.*, 576 F.3d at 1056. The courts look to the "completeness" and "calculability" of damages to determine the appropriateness of such an award. *See id.* Plaintiffs would at best have complete and calculable losses with respect to the principal amounts of their investments under the Loan Transaction Agreements, which can only be calculated with any certainty from the date the Complaint in this case was filed, and then only at the Utah statutory rate of 10% simple interest per annum given the inherent uncertainty of the Plaintiffs' own calculations. *See* Utah Code § 15-1-1(2); *USA Power, LLC v. PacifiCorp*, 2016 UT 20, ¶¶ 108-09, 372 P.3d 629. The Court exercises its discretion to award prejudgment interest.

### *The Hill Top Agreement*

28. **Contract.** The first element, a valid contract, has been met by the existence of the Hill Top Agreement.

29. **Performance by the Plaintiffs**. Defendants claim that Plaintiffs did not perform under the contract and are therefore not entitled to recover. Specifically, Defendants point to evidence that Plaintiffs communicated almost immediately that they did not intend to put any

money toward developing or partitioning Hill Top, and then in fact did not do so, and this constituted the first breach of the contract. However, Michelle and Tracey Baron's claim that Law and Deem breached paragraph 3(k) of the JVA, where Law and Deem were to contribute no more than $110,000 towards development, is without merit. Paragraph 3(k) expressly states that "Law and Deem are required to contribute *no more than* $110,000*,*" not that they had to contribute $110,000. Michelle and Tracey Baron did not request to draw on that $110,000, as they were required to do under JVA ¶ 3(v): "TBaron and/or MBaron must obtain prior written authorization from Law and Deem before expending more than $2,500.00 on any single expenditure of the 18901 Venture." Also, JVA ¶ 10 stated that "[t]he expenses of the 18901 Venture shall be advanced by the Party incurring those expenses and shall be reimbursed based upon *proper documentation* at such time as the expenses of the 18901 Venture are paid by the various Party(ies). . . ." (Emphasis added.)

30.     There are no requests in writing to draw on the $110,000 presented in the evidence. Without complying with paragraph 3(v) of the JVA – in the absence of a written request to draw on that $110,000 – there can be no breach of paragraph 3(k). Paragraphs 3(v) and 10 of the JVA use mandatory words, such as "must" and "shall." Tracey and Michelle Baron did not comply with these mandatory requirements. Thus the court finds that Law and Deem did not breach Paragraph 3(k) of the JVA.

***Breach by the Defendants***

## **Defendants' violation of the "No Lien" Provision of the Hill Top Agreement**

31.     Paragraph 3(g) of the JVA contains a "no lien" provision. It states: "**Any Party who violates this subparagraph hereby expressly releases their profits and/or interest in the subject property in favor of the remaining Parties.**" (Bold in original). Trial Trans. p. 44

32. Tracey and Michelle Baron both individually and jointly violated paragraph 3(g) of the JVA by allowing or causing liens to be filed against the Hill Top property.

    a. Tracey Baron's filing of the Oregon Claim of Construction Lien (Exhibit 249) is a violation of JVA ¶ 3(g) which contains a "no lien" provision.

    b. The failure to pay property taxes resulted in liens on the Hill Top property in violation of JVA ¶ 3(g). (Exhibit 273 ¶ 1).

    c. Tracey and Michelle Baron's execution of the Deed to Turning Leaf Homes (Exhibit 253) recorded on May 30, 2017, created a lien in favor of that entity.

    d. Michelle Baron's failure to pay state and federal income taxes resulted in liens against the Hill Top property. (Exhibit 257 ¶¶ 8 & 9).

33. The preceding violations of JVA ¶ 3(g) constitute material breaches of the JVA. Retroactive to the date of each breach of JVA ¶ 3(g), Michelle Baron forfeited her interest in the Hill Top property.

34. Tracey Baron also violated the intended purposes of the 18901 Venture and materially breached the JVA as follows:

    a. He failed to partition the additional lots "within 12 months from the date of the Agreement" (JVA ¶ 5(a)),

    b. He failed to pay property taxes (JVA ¶ 3(r)), allowing property tax liens to attach to the property (JVA ¶ (g)),

    c. He filed the Oregon Claim of Construction Lien (JVA ¶ (g)), and

    d. He failed to maintain insurance on the Hill Top property (JVA ¶ 3(r)).

35.     Michelle Baron violated the intended purposes of the 18901 Venture and materially breached the JVA as follows:

> a.      She failed to partition the additional lots "within 12 months from the date of the Agreement" (JVA ¶ 5(a)),
>
> b.      She failed to pay property taxes (JVA ¶ 3(r)), allowing property tax liens to attach to the property (JVA ¶ (g)),
>
> c.      She failed to maintain insurance on the Hill Top property (JVA ¶ 3(r)), and
>
> d.      She failed to keep the Hill Top property lien free by failing to pay state and federal income tax. (JVA ¶ (g)).

36.     Under the terms of the JVA, Michelle Baron forfeited her interest in the Hill Top property and the original of the Warranty Deed[3] became valid as of the date of her first material breach of the JVA -- December 18, 2014.[4]

37.     **Equitable Mortgage.** Tracey and Michelle Baron, in their Counterclaim, however, seek a declaration that "[Mr.] Law and [Mr.] Deem were only put on title to [Hill Top] for security purposes" and consequently "are not actually owners of [Hill Top] but instead merely have if anything an equitable mortgage thereon." ECF No. 87, at 54 ¶ 118.f. The court agrees and concludes that Plaintiffs' interest in Hill Top is an equitable mortgage, implied as such to assure Plaintiffs were repaid the amounts they loaned. *See Swenson v. Mills*, 108 P.3d 77

---

[3] The original Warranty Deed was lost by the escrow company, but Exhibit 251 is a copy.
[4] This date is based on the failure to partition the additional lots "with 12 months from the date of the Agreement" (JVA ¶ 5(a)). The JVA is dated December 18, 2013.

(Ore. App. 2005) (discussing Oregon Supreme Court case law and laying out factors to consider in determining equitable mortgage).

38.     As discussed in the case just cited, the issue is "whether, despite the outright conveyance of the property to plaintiff by deed, the transaction was nonetheless a security agreement." *Id.* at 80. "There is a presumption that a deed absolute on its face is what it purports to be unless and until proved otherwise by clear and convincing evidence." *Id.* (citation and quotations omitted). "If . . . it appears that the parties' intent was to convey and receive the property as security for the fulfillment of an obligation, then the form of the instrument becomes immaterial and the true nature of the transaction may be shown by parol evidence." *Id.* "That question is determined based on a consideration of the whole transaction, by the mutual intention of the parties *at the time the transaction was consummated.*" *Id.* (citation and quotations omitted) (emphasis in original).

39.     Factors that may be considered in determining the intent of the parties include:

(1) the situation of the parties including their business and social relationship, (2) price fixed in relation to the actual value of the property conveyed, (3) surrender of possession by grantor, (4) payment of taxes, (5) payment of rent, (6) liability by grantor to pay interest, (7) financial circumstances of the grantor, and (8) conduct of the parties before and after the transaction.

*Id.* at 80-81 (citation and quotations omitted). *See generally id.* (holding transaction in question, involving facial sale and lease, to be equitable mortgage). Utah law is essentially the same. *See, e.g.*, *BMBT, LLC v. Miller*, 2014 UT App 64, ¶ 9, 322 P.3d 1172 ("[P]arol evidence is admissible in equity to show that a deed, although absolute on its face, was intended as a mortgage. Generally, this is an issue for the fact-finder, who should examine a number of factors in determining the parties' intent.") (citing *Hansen v. Kohler*, 550 P.2d 186, 189 (Utah 1976)) (additional citation and quotations omitted).

40.     Considering these factors, the Court concludes that Plaintiffs held an equitable mortgage in the Hill Top property to secure repayment of the money they loaned. The Court rests this conclusion particularly on the testimony of Mr. Deem, a Plaintiff who testified unequivocally that the warranty deed (Ex. 250) was given to assure repayment of the monies advanced. (Deem testimony.) To hold otherwise would work an inequitable forfeiture of Michelle Baron's ownership interest in Hill Top, which resulted from a close personal relationship with the prior owner, an intent to purchase the home for her family, sweat equity, expenditures by her family of approximately $100,000 in improvements to the house, and negotiation with the former owner that resulted in her obtaining Hill Top for her family's residence as desired and intended.[5]

41.     The result of this conclusion, based on this and the evidence as a whole, is that the Plaintiffs' interest in Hill Top was a security interest only. Mr. Law's and Mr. Deem's interests are reflective of their initial loans of $248,000 respectively, which in turn are reflected in the court's determination of the Hill Top Agreement contract damages and declarations. Similarly, Michelle Baron's interest as owner of Hill Top is reflective of her "sweat equity" down payment at the time of the Hill Top purchase; her intent to purchase the home for her family; and her intent to borrow funds as needed from Plaintiffs to accomplish her goals.

42.     The court finds that Michelle Baron is the equitable owner of Hill Top, with equitable rights of redemption and sole right of possession, *subject to* an equitable mortgage in

---

[5] The Court rejects these Plaintiffs' suggestion made at trial that they were entitled *both* to a return of the purchase funds they provided *and* an ongoing 41.7% interest each in Hill Top. The Hill Top Agreement anticipated these Plaintiffs would be repaid their loans and then provided them a 15% interest each in any profits from developing and partitioning the property. (Ex. 1, at 1-2 ¶¶ 2-3.)

favor of Mr. Law and Mr. Deem of $248,000 each ($496,000 total), to secure these amounts owed to them by Michelle Baron.

43.    Exhibit 304 shows that Plaintiffs paid $13,145.56 for property taxes on Hill Top and $2,396.21 for insurance on Hill Top (the last entry being unpaid at the time of trial), for a total of $15,541.77 that Tracey and Michelle Baron were required to pay under ¶ 3(r) of the JVA.

44.    **Defendants' IRS Prohibited Transactions argument.**  Defendants argue that most of the elements of Plaintiffs' Breach of Contract claims have not been met because the Loan Transaction Agreements are void as a matter of law as IRS prohibited transactions and violative of state law.

45.    Defendants do not have standing to pursue any portion of the Counterclaim containing claims based on violation of the Internal Revenue Code "(IRC)" or its associated regulations. Counterclaim ¶¶ 73, 118, 143, 147 (ECF No. #87). The allegations essentially are that the Counterclaim Defendants used their Self Directed IRAs in a manner that violated sections of the IRC and its associated regulations, primarily IRC §§ 219, 408 & 4975.

46.    There is no statute granting a private right of action to any private party for another citizen's violation of the IRC. In the absence of an express private right of action in a given statute, there is a presumption that Congress did not intend to confer one. Accordingly, the party claiming an implied right of action bears a "heavy burden." *Olmsted v. Pruco Life Ins. Co.*, 283 F.3d 429, 433 (2d Cir. 2002). In *Cort v. Ash*, 422 U.S. 66, 45 L. Ed. 2d 26, 95 S. Ct. 2080 (1975), the Supreme Court listed four factors to guide judicial determination of whether a private right of action can be implied from a federal statute. *See Boisjoly v. Morton Thiokol, Inc.*, 706 F. Supp. 795, 806 (D. Utah 1988). First, the Counterclaim Plaintiffs are not "one of the class for

whose especial benefit the statute was enacted." Some of them are not even taxpayers, but rather are limited liability companies, which are pass-through entities. Second, there is no legislative intention to create any such remedy for the Counterclaim Plaintiffs. The analysis need go no further.

47. **<u>Quantum Meruit</u>**.  Plaintiffs' Third Cause of Action seeks recovery in quantum meruit. (ECF No. 124, at 7-8.) This is an alternative to the contract claim. Plaintiffs' proof for this claim was the same evidence as for their contract claim. Because the principal transactions were covered by written contracts, this claim is unnecessary and nonviable and is denied and dismissed. *See Northgate Vill. Dev., LC v. Orem City*, 2014 UT App 86, ¶ 49, 325 P.3d 123 (noting "[r]ecovery under quantum meruit presupposes that no enforceable written or oral contract exists") (citation and quotations omitted). Additionally, Plaintiffs have not identified or proven the elements of this claim. Furthermore, even if the claim were viable, damages under this claim would be addressed in the same way as any alleged damages already addressed by the Court in the contract claims. Plaintiffs are not entitled to a double recovery.

48. **<u>Unjust Enrichment</u>**.  Plaintiffs' Fourth Cause of Action asserts an unjust enrichment claim. (ECF No. 124, at 8-9.) This is an alternative to the contract claim. Plaintiffs' proof for this claim was the same evidence as for their contract claim. Because the principal transactions were covered by written contracts, this claim is unnecessary and nonviable and is denied and dismissed. *See Ashby v. Ashby*, 2010 UT 7, ¶ 14, 227 P.3d 246 ("Recovery under [unjust enrichment] presupposes that no enforceable written or oral contract exists.") (citation and quotation omitted). Additionally, Plaintiffs have not identified or proven the elements of this claim. Furthermore, even if the claim were viable, damages under this claim would be addressed

in the same way as any alleged damages already addressed by the Court in the contract claims. Plaintiffs are not entitled to a double recovery.

49. **Detrimental Reliance**.  Plaintiffs' Fifth Cause of Action alleges "detrimental reliance." (ECF No. 124, at 9-10.) This is a promissory estoppel claim, *see Andreason v. Aetna Cas. & Sur. Co.*, 848 P.2d 171, 175-76 (Utah App. 1993) (claim of detrimental reliance sounds in promissory estoppel), and an alternative to the contract claim. Plaintiffs' proof for this claim was the same evidence as for their contract claim. Because the principal transactions were covered by written contracts, this claim is unnecessary and nonviable and is denied and dismissed. *See E & H Land, Ltd. v. Farmington City*, 2014 UT App 237, ¶ 31, 336 P.3d 1077 ("Once a court determines that an enforceable contract exists and governs the subject matter of the dispute, the plaintiff is no longer free to maintain inconsistent legal claims for breach of contract and equitable claims for promissory estoppel or unjust enrichment.") (citation and quotations omitted). Additionally, Plaintiffs have not identified or proven the elements of this claim. Furthermore, even if this claim were viable, damages under this claim would be addressed in the same way as any alleged damages already addressed by the Court in the contract claims, *see supra*, and Plaintiffs are not entitled to a double recovery.

50. **Constructive Trust**.  Plaintiffs' Sixth Cause of Action requests imposition of a constructive trust. (ECF No. 124, at 10-11.) This is not in itself a cognizable claim. Rather, it is an equitable remedy that fails by itself to state a sustainable claim, as articulated in Utah case law and recognized by illustrative federal judicial decisions. *See Rawlings v. Rawlings*, 2010 UT 52, ¶¶ 26-32, 240 P.3d 754; *cf. Scholes v. Ames*, 850 F. Supp. 707, 712-13 (N.D. Ill. 1994) (dismissing constructive trust claim on summary judgment because it is an equitable remedy, not an independent cause of action), *aff'd sub nom. Scholes v. Lehmann*, 56 F.3d 750 (7th Cir. 1995);

*Swanson v. ALZA Corp.*, No. C 12-4579 PJH, 2013 WL 968275, at *13 (N.D. Cal. Mar. 12, 2013) (unpublished) (dismissing claim on 12(b)(1) and (6) motion because, under California law, "a constructive trust is an equitable remedy, not a cause of action"); *Bermuda Rd. Properties, LLC v. EcoLogical Steel Sys., Inc.*, No. 2:12-CV-01579-JAD-GWF, 2017 WL 797092, at *3 (D. Nev. Mar. 1, 2017) (unpublished) ("A constructive trust is not a standalone claim, it is an equitable remedy that redresses unjust enrichment, fraud, or misconduct.") (applying Nevada law). Nor have Plaintiffs separately identified or proven entitlement to such an equitable remedy under the claims they advance. Plaintiffs' separate cause of action seeking imposition of a constructive trust fails as a matter of law and is therefore denied and dismissed.

51.     **Conversion**.  Plaintiffs' Seventh Cause of Action advances a claim for conversion. (ECF No. 124, at 11-12.) Because the principal transactions are covered by written contracts, this claim is not only unnecessary but nonviable under Utah's economic loss rule. The "economic loss doctrine bars all tort claims seeking recovery for economic losses when the claims are not based on a duty independent of the contractual obligations between the parties." *Anapoell v. Am. Express Bus. Fin. Corp.*, No. 2:07-CV-198-TC, 2007 WL 4270548, at *6 (D. Utah Nov. 30, 2007) (unpublished). "[O]nce there is a contract, any tort claim must be premised upon an independent duty that exists apart from the contract. All contract duties, and all breaches of those duties . . . must be enforced pursuant to contract law." *Reighard v. Yates*, 2012 UT 45, ¶ 21, 285 P.3d 1168 (citation and quotations omitted). The economic loss doctrine, which allows parties to "allocate risks that may arise pre- or post-formation" of a contract, applies "to conduct regardless of whether it preceded or post-dated the contract." *Donner v. Nicklaus*, 778 F.3d 857, 873-74 (10th Cir. 2015). Plaintiffs' claims sound in contract, and their contract claims remained viable through trial, though they were disputed. The damages claimed arose from the parties' contracts

and alleged breach thereof. Plaintiffs have not identified any other basis for a duty outside the contract context. Nor have Plaintiffs independently met the elements of a conversion claim. *See Fibro Tr., Inc. v. Brahman Fin., Inc.*, 1999 UT 13, ¶ 20, 974 P.2d 288 ("A conversion is an act of wilful interference with a chattel, done without lawful justification by which the person entitled thereto is deprived of its use and possession.") (citation and quotations omitted). The conversion claim therefore fails and is denied and dismissed.

52.     **Breach of Fiduciary Duty.**  Plaintiffs' Eighth Cause of Action asserted a claim for breach of fiduciary duty at the time their Third Amended Complaint was filed. (ECF No. 124, at 12-14.) However, Plaintiffs subsequently withdrew this claim in their second summary judgment motion, stating their position with respect to the Loan Transaction Agreements that such transactions were "merely loans made at arm's length" and that "[n]o special duty arose from these loans, at least there is no evidence to suggest as much." (ECF No. 186, at 17.) Plaintiffs then suggested that the Hill Top Agreement "is, perhaps, a different matter" and that they had alleged a breach of fiduciary duty under this agreement. (*Id.* at 17-18.) They concluded, however: "Plaintiffs now believe that they do not have sufficient evidence to continue, and do withdraw the claim at this time." (ECF No. 186, at 18.) Plaintiffs' fiduciary duty claim was therefore withdrawn and abandoned before trial in its entirety and is consequently denied and dismissed.

53.     **Fraud in the Inducement - Repayment.**  Plaintiffs' Ninth Cause of Action alleges fraud in the inducement with respect to the alleged nonpayment of the contract sums. (ECF No. 124, at 14-16.) To prove fraud, Plaintiffs would have to plead with particularity and prove nine elements by clear and convincing evidence:

(1) that a representation was made (2) concerning a presently existing material fact (3) which was false and (4) which the representor either (a) knew to be false or (b) made recklessly, knowing that there was insufficient knowledge upon which to base such a representation, (5) for the purpose of inducing the other party to act upon it and (6) that the other party, acting reasonably and in ignorance of its falsity, (7) did in fact rely upon it (8) and was thereby induced to act (9) to that party's injury and damage.

*Franco v. The Church of Jesus Christ of Latter-day Saints*, 2001 UT 25, ¶ 33, 21 P.3d 198. The Court concludes that this claim fails, for at least the reasons set forth in the following paragraphs.

54. Plaintiffs did not plead this claim with particularity as required by law. (ECF No. 124, at 14-16.) Missing from their pleading are the "who, what, where, when, and how" specifics required by the pleading standards in this Circuit. *See id.* (citing elements)*; Schwartz v. Celestial Seasonings, Inc.,* 124 F.3d 1246, 1252 (10th Cir. 1997) (fraud allegation must "set forth the time, place, and contents of the false representation, the identity of the party making the false statements and the consequences thereof") (citation and quotations omitted); *City of Raton v. Arkansas River Power Auth.*, 600 F. Supp. 2d 1130, 1142 (D.N.M. 2008) ("At a minimum, Rule 9(b) requires that a plaintiff set forth the who, what, when, where and how of the alleged fraud.") (citation and quotations omitted).

55. Plaintiffs have not demonstrated that all the elements of the claim have been met. In particular, Plaintiffs have not demonstrated by clear and convincing evidence that any particular material representation was knowingly or recklessly false when made by any particular defendant about a presently existing fact; that any such was made for the purpose of inducing the Plaintiffs to act upon it; or that the Plaintiffs did in fact rely upon it and were thereby induced to act to their injury and damage. Rather, the evidence firmly evinces a contractual relationship gone bad, in which the parties entered into written agreements, then met circumstances in the

course of the contract relationship that negatively affected performance. The parties vehemently disagree on and dispute the cause of those circumstances, but the facts do not present a fraud scenario. This case is a contract case first and foremost, and the Plaintiffs have not clearly and convincingly demonstrated otherwise. *Cf. Cerritos Trucking Co. v. Utah Venture No. 1*, 645 P.2d 608, 612 (Utah 1982) ("[I]f the promise is made in good faith when the contract is entered into, there is no fraud though the promisor subsequently changes his mind and fails or refuses to perform.").

56.     The evidence at trial was that Plaintiffs were induced by prior performance to enter into further Loan Transaction Agreements, and not by any particular unnamed promise. Furthermore, the promises Plaintiffs apparently say induced them into agreements were the promises in the agreements themselves. Under this scenario, the claim sounds in contract, not fraud. Additionally, the promises were made by entity Defendants, while this claim is asserted only against Tracey Baron. (ECF No. 124, at 14-16.)

57.     Because the Plaintiffs have not met their high burden of proof on this cause of action, their claim is denied and dismissed

58.     **<u>Fraud in the Inducement – Trust Guaranty.</u>**  Plaintiffs' Tenth Cause of Action alleges fraud in the inducement with respect to the Trust guaranty language included in some of the Loan Transaction Agreements. (ECF No. 124, at 16-19.) The Court concludes that this claim fails as well, for at least the reasons set forth in the following paragraphs.

59.     This claim fails for all the same reasons as those set forth in discussion of Plaintiffs' Ninth Cause of Action, *supra*, which is incorporated here by reference. The Plaintiffs

have failed to plead with particularity and prove all the elements of this claim by clear and convincing evidence.

60.     Plaintiffs were induced to continue entering into Loan Transaction Agreements by prior outstanding performance and returns and not by the Trust guaranty language. This is evidenced especially by the fact Plaintiffs continued entering into such agreements regardless of whether the Trust guaranty language was there, and they raised no objection if it was omitted. Plaintiffs have failed to demonstrate by clear and convincing evidence that any representation made about the Trust guaranty was material to the Plaintiffs' decision to enter into any agreement with any Defendant. Rather, the evidence shows that the Plaintiffs' early history of reaping substantial returns from their contracts with the Defendants was the principal inducement for their continuing to enter into such contracts. This is shown not only by the fact that the Plaintiffs entered into the early contracts without any such guaranty, but also by the fact the Plaintiffs entered into a sizeable number of contracts that did not have the guaranty even after the guaranty concept was first introduced. Their actions demonstrate that the guaranty language was not the inducement for entering the agreements and that they were willing to contract even absent such language. On this record, the elements of the fraud-in-the-inducement claim have not been met with the requisite clear and convincing evidence.

61.     Plaintiffs have also failed to prove by clear and convincing evidence that Defendants knowingly or recklessly misrepresented any presently existing fact about the Trust guaranties. Defendants introduced substantial evidence that they did not know that Jeff Long, trustee of the Trust, had mishandled funds or impeded their availability until these facts came to light in 2015. After that, Defendants sent a demand to Mr. Long through counsel, terminated their relationship with him, did not enter into further Loan Transaction Agreements guaranteed

by the Trust, and reported Mr. Long to the Oregon State Bar. The Court notes that the amount disbursed and outstanding by the Trust did not exceed the amount available under Defendants' agreements with the Trust. (Ex. 256, at 3 ¶ 7; Ex. 1068, at 1.) Moreover, Defendants were not declared in default under the agreements with the Trust until 2015 (Ex. 256, at 3 ¶ 8) and were not sued with respect to the same until 2017 (Ex. 256, at 21). They entered no further Loan Transaction Agreements with Trust guaranties after these dates. Under these undisputed circumstances, Plaintiffs have failed to make out their fraud-in-the-inducement case with the requisite clear and convincing evidence. *See Colorado v. New Mexico,* 467 U.S. 310, 316 (1984) (clear and convincing evidence must give the trier of fact "an abiding conviction that the truth of . . . factual contentions [is] 'highly probable'" (quoting C. McCormick, *Law of Evidence* § 320, at 679 (1954)); *Foster v. Alliedsignal, Inc.*, 293 F.3d 1187, 1194 (10th Cir. 2002) (clear and convincing evidence standard requires a quality of proof that is "certain, unambiguous, and plain to the understanding" and "reasonable and persuasive enough to cause the trier of facts to believe it") (citation and quotations omitted); *United States v. Cox*, 635 F. Supp. 1047, 1051 (D. Kan. 1986) (clear and convincing standard "rightly places a heavy burden" on plaintiffs) (citation and quotations omitted).

62.     Because the Plaintiffs have not met their high burden of proof on this cause of action, their claim is denied and dismissed.

63.     **<u>Extortion</u>**.  Plaintiffs' Eleventh Cause of Action alleges a civil claim for "extortion." (ECF No. 124, at 19-21.)  During the Oxbow transaction, Tracey Baron threatened criminal action if Law and Deem did not sign the releases.   Exhibits 167 & 168.  Plaintiffs argue that they were extorted into signing the releases.  Utah Code Ann. § 76-6-406(1)(2)(d).   They claim that Tracey Baron knew these threats of criminal action were baseless when he made them,

and that making baseless threats constitutes material misrepresentation. Law and Deem assert

that in executing the releases (Exhibit 167 & 168) they reasonably relied on the threats as viable,

and thus the releases are void.

64.     The court finds, however, that "there is currently no civil cause of action

for extortion, and thus, there is no legal remedy." *Harvey v. Ute Indian Tribe of Uintah & Ouray*

*Reservation*, 2017 UT 75, ¶ 73, 416 P.3d 401. Rather, "[t]he creation of such a cause of action is

a matter best left to the legislature." *Id.*  Plaintiffs' civil extortion claim therefore fails as a matter

of law and is denied and dismissed.  Plaintiffs voluntarily waived their claims for profits on the

Oxbow transaction before the transaction closed. Plaintiffs are not entitled to any damages for

alleged lost profits on the Oxbow transaction.

65.     **Reformation of Deed**.  Plaintiffs' Twelfth Cause of Action seeks to reform the

Hill Top deed to place Plaintiffs as sole owners of the property, based on the escrow company's

loss of the original warranty deed given as security. (ECF No. 124, at 21-23; *see also* ECF No.

186, at 64-66.) Reformation is not an appropriate claim or remedy with respect to a lost deed.

"Reformation is an equitable remedy that permits the court to add new terms to a deed or alter

the original language of a deed to conform to the parties' intent." *FDIC v. Taylor*, 2011 UT App

416, ¶ 26, 267 P.3d 949, *quoted in City Nat'l Bank, N.A. v. Breslin*, 175 F. Supp. 3d 1314, 1327

(D. Utah 2016) (Waddoups, J.). Here, in contrast, a lost deed relates to proof of the contents of a

document, which is addressed through the Court's evidentiary rules. *See, e.g.*, Fed. R. Evid.

1002-1004. Plaintiffs admitted a copy of the lost original under the rules (Ex. 250, admitted

pursuant to parties' stipulation), allowing them to present their arguments in context in the

course of these proceedings. *See* Fed. R. Evid. 1003, 1004(a)-(b). They therefore had no need for

or entitlement to a deed "reformation" – *i.e.*, a ruling from this Court that the copy of the original said something different than what the parties intended or agreed.

66.     The problem with the deed copy, as testified to by the Plaintiffs, was that the county recorder in Oregon would not allow a copy of the deed to be recorded. The relief the Plaintiffs seek is apparently a court order directed to the escrow company and/or the county recorder in Oregon. Such relief relates to claims and parties beyond the jurisdiction of this Court and outside the scope of these proceedings.

67.     Additionally, reformation is an equitable remedy available when legal remedies are inadequate. *See Switzer v. Coan*, 261 F.3d 985, 991 (10th Cir. 2001) "[T]his court . . . has repeatedly applied the general rule that equitable relief is available only in the absence of adequate remedies at law.") (collecting cases). The Court concludes the Plaintiffs have available to them adequate remedies at law through their other claims advanced herein and through their claims in the Oregon Bankruptcy Court. Equitable reformation of the warranty deed therefore is not required.

68.     Furthermore, even if reformation of the warranty deed were an appropriate remedy, it would not serve any apparent purpose at this stage, as the Plaintiffs are not positioned to simply record the warranty deed in their favor. This is true both because they are not entitled to that relief, as concluded above, and because this Court's conclusions are an intermediate step to ultimate resolution by the Oregon Bankruptcy Court of entitlement to interests in Hill Top. The orders of this Court and of the Oregon Bankruptcy Court should be adequate authority for any third party to rely upon if the Plaintiffs take the proper legal steps to implement them. If

Plaintiffs still meet resistance from recalcitrant third parties, they have recourse to courts of competent jurisdiction to see that such orders are obeyed.

69.     Despite calling it reformation, Plaintiffs' governing pleading actually sets forth claims for breach of contract and specific performance. (ECF No. 124, at 21-23.) The Court has already dealt with the contract claims. Because of the intervening bankruptcy court proceeding filed by Mrs. Baron, the Oregon Bankruptcy Court, not this Court, has jurisdiction over the Hill Top property in Oregon. Therefore, specific performance is not available in this Court as a remedy. But even if it were, Plaintiffs have not shown they are entitled to this relief.

70.     For each of these reasons, independently and collectively, the Plaintiffs' reformation claim is denied and dismissed.

**Defendants' Defenses and Counterclaims**

71.     **Declaratory Judgment.** Defendants' First Claim for Relief seeks a declaratory judgment with respect to the parties' disputes, including an order quieting title to Hill Top in the Defendants. (ECF No. 87, at 53-55.) The request for an order from this Court quieting title in Hill Top is denied because Defendants previously withdrew and abandoned a quiet title claim as such. (ECF No. 215, at 18.) The Court declares that the parties are entitled to the relief set out in these Findings of Fact and Conclusions of Law and the final judgment to be entered hereon. All other grounds on which the Defendants have requested declaratory relief are denied.

72.     **Mitigation.** Defendants' Answer to the Third Amended Complaint asserted as an affirmative defense "[a]ny other matter constituting an affirmative defense which is supported by the evidence adduced during discovery or at trial." (ECF No. 87, at 16 ¶ 17; *see id.* at 14-16.) Mitigation fits that bill. *See also* Fed. R. Civ. P. 15(b)(2) (issues tried by consent treated as if

pleaded). In addition to any mitigation grounds identified in the other paragraphs of these findings and conclusions, Plaintiffs rejected two offers on Hill Top, including a high offer of $650,000, because they wanted more money. (T. Baron testimony; Law testimony; Exs. 1092, 1094.) This is unreasonable failure to mitigate under all the circumstances, including the fact that the offers came in during 2016 and 2017 when the parties were at odds with each other and Plaintiffs had already filed suit. *See Angelos v. First Interstate Bank of Utah,* 671 P.2d 772, 777 (Utah 1983) ("The doctrine of avoidable consequences, also referred to as mitigation of damages, generally operates to prevent one against whom a wrong has been committed from recovering any item of damage arising from the wrongful conduct which could have been avoided or minimized by reasonable means."), *quoted in John Call Eng'g, Inc. v. Manti City Corp.*, 795 P.2d 678, 680 (Utah App. 1990) (applying doctrine to contract claims, noting that "[i]n an action for damages for breach of contract, the amount of damages otherwise recoverable by plaintiff can be reduced if plaintiff succeeded in mitigating its damages or if it failed to properly mitigate its damages"); *see also* MUJI 2d CV2020 (mitigation instruction). If either of these offers had been accepted, Plaintiffs would have received back their funds and been made whole and/or had the resources of this Court to assist them in obtaining and preserving the funds from any such sale. Their failure to accept these offers under these circumstances demonstrates a failure to mitigate. The Court determines that the effect here should be to limit any damages suffered by the Plaintiffs to a return of the funds they loaned on Hill Top, as already determined by the Court in connection with discussion of the contract claims.

73. **Breach of Fiduciary Duty.** Defendants' Third Claim for Relief seeks, among other things, damages for Plaintiffs' breach of fiduciary duty. (Dkt. 87, at 56-58.) Defendants argue that this claim goes hand-in-hand with the fact that the Loan Transaction Agreements as

structured and implemented by the Plaintiffs constitute IRS prohibited transactions. For the reasons described in the court's discussion of IRS prohibited transactions above, the court does not adopt Defendants' proposed conclusions regarding breach of fiduciary duty. This claim is hereby denied and dismissed.

74.     **Breach of Covenant of Good Faith and Fair Dealing.** Defendants' Third Claim for Relief also seeks recovery for breach of the covenant of good faith and fair dealing. (Dkt. 87, at 56-58.) A covenant of good faith and fair dealing inheres in every contract in Utah. *See Rawson v. Conover*, 2001 UT 24, ¶ 44, 20 P.3d 876 (noting both the UCC and the common law contain this requirement) (collecting citations); *cf.* Utah Code § 70A-1a-304. "Under the covenant of good faith and fair dealing, each party promises not to intentionally or purposely do anything which will destroy or injure the other party's right to receive the fruits of a contract. . . " *Rawson*, 2001 UT 24, ¶ 44 (citation and quotations omitted). "[T]o comply, a party must act consistently with the agreed common purpose and the justified expectations of the other party." *Id.* (citations and quotations omitted). "In analyzing for compliance with the covenant, both the contract language and the course of conduct between the parties should be considered to determine the parties' purpose, intentions, and expectations." *Id.*

75.     The Court concludes that the Plaintiffs breached the covenant of good faith and fair dealing in the Hill Top Agreement when Plaintiffs failed to approve sales of Hill Top presented to them. The Court concludes that the damages are those identified earlier as contract damages. *See Beck v. Farmers Ins. Exch.*, 701 P.2d 795, 798 & n.1 (Utah 1985) (breach of implied covenant is breach of contract, and the claim sounds in contract). There may be no double recovery.

76.    **Fraud.** Defendants' Fourth Claim for Relief asserts a cause of action for fraud. (Dkt. 87, at 58-59.) Defendants concede that the elements of their fraud claim have not been met on this record by clear and convincing evidence. As the evidence attests, this is a heavily disputed contract case, not a fraud case. Defendants' fraud claim is therefore denied and dismissed.

77.    **Failure of Consideration.** Defendants' Fourth Claim for Relief also pleads failure of consideration. (Dkt. 87, at 58-59.) "Where consideration fails, there was a contract when the agreement was made, but because of some supervening cause, the promised performance fails." *Gen. Ins. Co. of Am. v. Carnicero Dynasty Corp.*, 545 P.2d 502, 504 (Utah 1976). "Thus, failure of consideration is an affirmative defense as set forth in Rule 8(c)." *Id.* at 504-05. Though pleaded as a counterclaim, the court will treat it as the defense it is. *See* Fed. R. Civ. P. 8(c)(2). As described in the court's discussion of the contract counterclaim discussed above, the court concludes that Defendants have not established their failure of consideration defense, and even if they had, they would not be entitled to a double recovery.

78.    **Unjust Enrichment.** Defendants' Eighth Claim for Relief asserts an unjust enrichment claim. (ECF No. 87, at 62-63.) "To establish a claim for unjust enrichment, a plaintiff must show: (1) a benefit conferred . . . ; (2) an appreciation or knowledge by the conferee of the benefit; and (3) the acceptance or retention [of the benefit] by the conferee . . . under such circumstances as to make it inequitable for the conferee to retain the benefit without payment of its value." *U.S. Fidelity & Guar. Co. v. U.S. Sports Specialty Ass'n*, 2012 UT 3, ¶ 12, 270 P.3d 464 (citation and quotations omitted). This is an alternative to the contract claim. Under this theory, Defendants' damages will be treated the same as under their contract theory, but Defendants are not entitled to a double recovery.

79. **Ouster.** Defendants' Ninth Claim for Relief alleges an illegal ouster of Michelle Baron from Hill Top. (Dkt. 87, at 63-64.) Defendants argue "[t]hat one cotenant is not liable to his cotenant for rents for the occupancy of the common property is elemental. And this is true even though [the cotenant] uses it and derives income therefrom, . . . as long as he does not interfere with the cotenant's right to likewise occupy, use and enjoy." *Id.* However, in this case, Tracey and Michelle Baron signed a Residential Lease Agreement backdated to December 15, 2013 (Exhibit 263) requiring them to pay rent on the Hill Top property to DJ Property Solutions (David Law) $2,500 a month. Trial Day 2. The parties anticipated that Tracey and Michelle Baron would either obtain permanent financing requiring payments of $2,500 per month or pay rent of $2,500 a month. Michelle Baron acknowledged that after she received her interest in Hill Top (Exhibit 251), she intended to continue paying rent. Michelle Baron testimony, Day 4, cross-examination. No one agreed that the Barons could live in the Hill Top property rent free. This claim is hereby denied and dismissed.

80. **Defamation.** Defamation was raised in Defendants' Counterclaim, addressed on summary judgment, and tried at trial as a standalone claim. (Dkts. 87, at 57 ¶ 124.f; 253, at 2, 3-5, 12; 259, at 22-24; *see also* Fed. R. Civ. P. 15(b)(2) (issues tried by consent treated as if pleaded). Defendants argue that statements from Plaintiffs David and Janine Law that Tracey Baron committed fraud, stole money, could not be trusted, was taking money from others "under the table," and would be going to jail if they acted to "pressure" tenants in any way are defamatory. Defendants have not proven this claim to the Court's satisfaction.

81. Defendants have noted that by this time, amicable relations between the parties had ended, and were replaced by substantial mistrust, distrust, bickering, and disputed conduct. Feelings between the parties remained particularly tense and bitter, and both sides made

derogatory comments which may fairly be characterized as unprofessional and even blameworthy. Because of the nature of the parties' relationship and the animosity on both sides, the court finds that the Defendants have not proven that the statements by Plaintiffs were published with the required degree of fault for defamation. The defamation claim is hereby denied and dismissed.

82.     **Waiver.** Defendants pleaded waiver as an affirmative defense. (Dkt. 87, at 15 ¶ 7.) To the extent Plaintiffs claimed at trial that they were entitled to unpaid profits from the Oxbow transaction, such claim was voluntarily waived by the Plaintiffs' signing releases (Exs. 167-68) before the Oxbow closing. *See Mounteer Ents., Inc. v. Homeowners Ass'n for the Colony at White Pine Canyon*, 2018 UT 23, ¶ 17, 422 P.3d 809 (waiver is the intentional relinquishment, express or implied, of a known right). Plaintiffs did not reserve their rights in doing so, and this lawsuit was not pending at the time.

### Entry of final judgment

83.     Rule 58(a) of the Federal Rules of Civil Procedure requires that "[e]very judgment . . . must be set out in a separate document," with exceptions that do not apply here.

84.     The Plaintiffs are directed to prepare, within 14 days of this ruling, a proposed form of judgment consistent with this court's ruling and to present it to the Defendants for approval as to form or objection before filing it with the court, pursuant to DUCivR 54-1(b). The court will then enter a final judgment in this case reflecting its rulings herein.

85.     These Findings of Fact and Conclusions of Law, and the final judgment to be entered pursuant hereto, encompass all outstanding issues, motions, objections, and other matters not addressed in prior orders. Any relief not specifically granted herein is denied.

86.     Based on the foregoing Findings of Fact and Conclusions of Law, the evidence and briefing in this case, the pleadings, and all other matters of record, and for good cause appearing, the Court hereby orders the entry of a final judgment containing the following terms:

1. Judgment in favor of the Law Plaintiffs and against those entity Defendants to be determined jointly by the parties in preparing the final judgment for $91,475.96, based on the principal amount identified in Exhibit 300 as these Plaintiffs' interests may appear therein.

2. Judgment in favor of the Deem Plaintiffs and against those entity Defendants to be determined jointly by the parties in preparing the final judgment for $61,828.46, based on the principal amount identified in Exhibit 300 as these Plaintiffs' interests may appear therein.

3. Judgment in favor of Plaintiffs against Tracy Baron for the $41,000 in rents that Baron collected and deposited in a separate account and then withdrew and spent without permission, plus prejudgment interest.

4. Plaintiff's Rule 12(b)(1) and (6) Motion to Dismiss Counterclaim Founded on Internal Revenue Code violations is granted.

5. Declaratory judgment in favor of Michelle Baron as follows: Michelle Baron is declared to be the equitable owner of Hill Top, with equitable rights of redemption and sole right of possession, subject to an equitable mortgage in favor of Mr. Law and Mr. Deem of $248,000 each ($496,000 total), to secure these amounts owed to them by Michelle Baron.

6.  Breach of contract damages in favor of Plaintiffs and against Tracey and Michelle Baron in the amount of $2,500 a month for 23 months (unpaid rent on the Hill Top property from May 2015 until April 2017), for a total of $57,500.

7.  Damages in favor of David Law and against Tracey and Michelle Baron in the amount of $15,541.77 for taxes and insurance that David Law paid to protect Plaintiffs' interest in Hill Top when the Barons failed to pay the insurance and taxes that they were required to pay under the JVA ¶ 3(r).

SO ORDERED this __10th__ day of January, 2020.

BY THE COURT:

David Sam
United States District Judge